THE LAW OFFICES OF GREGORY W. SMITH
Gregory W. Smith, State Bar No. 134385
Diana Wang Wells, State Bar No. 284215
9100 Wilshire Boulevard, Suite 345E
Beverly Hills, California 90212
Telephone No. 1-310-777-7894
Telecopy No. 1-310-777-7895
Email dwells@gwslegal.com

THE LAW OFFICES OF JOHN A. SCHLAFF
John A. Schlaff, State Bar No. 135748
2355 Westwood Boulevard, No. 424
Los Angeles, California 90064
Telephone No. 1-310-474-2627
Telecopy No. 1-310-362-8883
Email john.schlaff@gmail.com

Counsel for Plaintiff,
NOAH KIRK

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOAH KIRK,<br><br>      Plaintiff,<br><br>vs.<br><br>LOS ANGELES COUNTY, JOE DEMPSEY, ERIC PARRA, GINA PARRA, CHRISTY GUYOVICH, JOHANN THRALL, GABE RAMIREZ, MILTON MURPHEY, BRANDON LEFEVRE, JOHN KEPLEY, JOEL BARNETT, PATRICK VALDEZ, YVONNE O' BRIEN, JESSICA TEND AND DOES 1-200,<br><br>      Defendants. | CIVIL ACTION NO.<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES** |

# COMPLAINT

1. The plaintiff, Noah Kirk ("Plaintiff"), complains for entry of judgment in his favor against Defendants County of Los Angeles, the Los Angeles County Sheriff's Department, ERIC PARRA, GINA PARRA, CHRISTY GUYOVICH, JOHANN THRALL, GABE RAMIREZ, MILTON MURPHEY, BRANDON LEFEVRE, JOHN KEPLEY, JOEL BARNETT, PATRICK VALDEZ, YVONNE O' BRIEN, JESSICA TEND and Does 1-200 (collectively, "Defendants").

2. In support of his Complaint, Plaintiff alleges and avers as follows:

## NATURE OF ACTION AND JURISDICTION

3. This civil action arises under 42 U.S.C § 1983, *inter alia*,, seeking damages and injunctive relief against Defendants for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiff of rights secured under the Constitution and laws of the United States; retaliating against Plaintiff for his exercise of his constitutionally protected right of free speech, to cooperate with federal investigators; and for refusing or neglecting to prevent such deprivations and denials to Plaintiff.

4. This case arises under the United States Constitution and 42 U.S.C. §§ 1983 and 1988, as amended. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343. The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983 and Rule 57 of the Federal Rules of Civil Procedure.

5. This Court is an appropriate venue for this Complaint pursuant to 28 U.S.C. 1391(b)(1) and (b)(2). The actions complained of took place in this judicial district; evidence and employment records relevant to the allegations are maintained in this judicial district; Plaintiff would be employed in this judicial district but for the unlawful actions and practices of the Defendants; and the Defendants are domiciled and regularly conduct affairs in this judicial district.

6. In addition, the Court has pendant jurisdiction over the California State Law

claims asserted in this Complaint.

## PARTIES

**Plaintiff**

7. Plaintiff Noah Kirk is a deputy Sheriff who was employed as a Los Angeles Deputy Sheriff at all times relevant herein. As shall be seen, Mr. Kirk was one of the few deputy sheriffs in the LASD who was instrumental in providing testimony which led to the conviction of Sheriff Lee Baca, Undersheriff Paul Tanaka and numerous other corrupt officials working at their behest, and otherwise working to address significant, systematic corruption which was and is still pursued as a matter of county policy within the LASD, a significant component of which was a code of silence with regard to LASD misconduct which persists to this day. Mr. Kirk broke that code of silence. He would be repaid for his acts of courage by shunning, humiliation and ultimately the termination of his career pursuant to the still extant "punish the whistleblowers" policy of the LASD which the Defendants in this action helped Baca and Tanaka carry out during their tenure at the LASD, and which the Defendants continue to carry out even after the arrest, trial and conviction of Baca and Tanaka.

**Defendants and Related Entities**

8. Los Angeles County Sheriff's Department (the "LASD") is one of the largest, if not the largest, Sheriff's departments in the Country. It is overseen by and is an agency of Defendant Los Angeles County which, as a matter of policy, defers to and endorses the corrupt policies of the LASD's leadership. It is also the former Plaintiff's former and present putative employer. Among other things, LASD is in charge of maintaining and guarding the Men's Central Jail (the "MCJ").

9. Defendants ERIC PARRA, GINA PARRA, CHRISTY GUYOVICH, JOHANN THRALL, GABE RAMIREZ, MILTON MURPHEY, BRANDON LEFEVRE, JOHN KEPLEY, JOEL BARNETT, PATRICK VALDEZ, YVONNE O' BRIEN, JESSICA TEND and Does 1-50 were and/or still are officers, officials and/or civilian employees within the LASD who implemented the foregoing LASD policies in

general, and against Plaintiff in particular. These Defendants were among the persons with supervisory power over Plaintiff during his tenure at the LASD and each of them were part of the cabal seeking to maintain the status quo of silence with regard to systematic corruption within the LASD.

10. Plaintiff is informed and believes and thereon alleges that each of the Defendants was acting in concert with, and at the direction of, the other Defendants in a joint effort to chill and retaliate against Plaintiff's exercise of his constitutional right to free speech, and to give truthful testimony in the federal courts as a result of their animus toward him in connection with his doing same.

11. The true names and capacities of Does 1-200 are currently unknown to Plaintiff, but Plaintiff is informed and believes that they contributed to or caused his injuries complained of herein. Plaintiff will amend this complaint as their identities are discovered.

## FACTS

**Background Giving Rise to Defendants' Animus.**

12. Plaintiff was hired as a deputy sheriff in 2006.

13. In August of 2008, Plaintiff was assigned to work on the "Fallen Hero" task force in connection with researching murder of Deputy Juan Able Escalante.

14. After the murder was solved, and the task force was disbanded, Plaintiff continued to work with the lead investigator on a number of matters, and with others concerning corruption and crime activity within the MCJ. Plaintiff's continuing work in this regard caused him to work interfacing with other law enforcement agencies, including the Federal Bureau of Investigation.

15. In September of 2011, during a routine search of inmates inside the MCJ, personnel of the LASD discovered a cellular telephone (the "Cell Phone") amidst the property of an inmate named Anthony Brown. Unauthorized possession of a cellular telephone is a felony violation.

16. The investigation of that violation was ultimately assigned to Deputies Gerald

Smith and Mickey Manzo. During the course of his investigation, as a result of monitoring Mr. Brown's telephone communications throught the Inmate Telephone Monitoring System (the "ITMS"), Deputy Smith came to suspect that the Cell Phone had been provided to Mr. Brown by someone connected with law-enforcement.

17. In fact, Anthony Brown was an FBI informant who had been given the Cell Phone by the FBI agents working with him. Mr. Brown was part of the FBI's investigation of corruption within the LASD and would ultimately lead to the ouster and/or criminal indictment of among others, Sheriff Lee Baca, Undersheriff Robert Tanaka, Deputies Smith and Deputy Manzo for a variety of charges, including, among others, those based upon these men's efforts to impede the FBI's investigation into MCJ corruption.

18. Plaintiff and Deputy Smith discussed the possibility that the Cell Phone had been given to Mr. Brown by a corrupt deputy sheriff. Deputy Smith on this basis asked Plaintiff to reach out to his contacts in the FBI to trace the origin of calls made on the Cell Phone.

19. As requested, Plaintiff contacted a crime analyst within the FBI, explained to her the circumstances, and asked her to do a work-up on the telephone number Anthony Brown called. Later that day, the analyst contacted Plaintiff and informed him that the telephone number Inmate Anthony Brown called belonged to he FBI's Civil Rights Department. Plaintiff and the FBI analyst agreed that they would both contact their respective supervisors of the fact and content of their correspondence.

20. Approximately one year later, Plaintiff would be subpoened to testify before the Grand Jury. Plaintiff's testimony went forward on September 12, 2012. Plaintiff would also be called upon to repeatedly testify in other criminal proceedings involving Lee Baca, Paul Tanaka and the cadre of deputies indicted with them in 2014.

21. Plaintiff would continue to work with a federal task force (the "Federal Task Force") the FBI and other policing agencies investigating corrupt deputies working

with that organization and had excellent reviews for his work. However, Plaintiff began to sense a great deal of hostility to him from certain quarters in the department. Among others, each of the named Defendants set out to harrass, humiliate and discriminate against Plaintiff in various ways discussed in greater detail below, all in furtherance of the LASD's policy of punishing and, if possible, silencing whistleblowers within the department.

22. Among others, Defendant Chief Eric Para, in June of 2014, made several angry comments to Plaintiff communicating that Plaintiff's cooperation with the federal authorities had not gone unnoticed and would not go unpunished. Among others, Chief Para hinted to Plaintiff that he thought that Plaintiff was surreptitiously taping him. He also explicitly told Plaintiff that no one in the department trusted him and that he had no friends there. Plaintiff is informed and believes and thereon alleges that in engaging in such acts, Chief Eric Para was seeking to -- and succeeding in -- carrying out the County's "punish the whistle-blowers" policy.

23. Shortly thereafter, Defendant Lt. Johann Thrall of the LASD called Plaintiff into his office and informed him that any and all of Plaintiff's reports to the FBI should pass through Lt. Thrall's offices. He further mentioned in that meeting that Plaintiff might have better opportunities in the LASD by leaving the OSJ and going back to partrol. Lt. Thrall also stated that he saw no reason for Plaintiff to necessarily be involved in further federal investigations of corruption when his current set of investigations were concluded. Plaintiff is informed and believes and thereon alleges that Lt. Thrall intended all of these comments as thinly veiled hints that Plaintiff was no longer welcome in his position, all in furtherance of the LASD's policy of punishing and silencing whistleblowers.

24. Despite these and other communications of suspicion and animus from various of his supervisors, Plaintiff continued to do his investigative work with integrity. He also vocally advised other OSJ investigators to resist management pressure to lie about their investigative findings in written reports to their superiors on at least one

occasion.

25. Plaintiff began to notice an alarming trend that various of the informers who worked with Plaintiff on his investigations of gang activity in the MCJ were being put in harm's way by his superiors by those informers being put into contact with members of the very gangs they were informing upon and from whom they were supposed to be isolated. Lt. Kevin Lloyd of the LASD noticed the same and complained to Defendants Captain Joe Dempsey (who is now a Commander) and Chief Parra of the LASD about it. Captain Dempsey shortly thereafter called Plaintiff, informed Plaintiff that Lt. Lloyd had accused both Dempsey and Chief Parra of obstructing federal investigations in this and other manners and demanded in a hostile and threatening tone that Plaintiff agree that Lt. Lloyd's criticisms were unfounded (even though Plaintiff is informed and believes that Captain Dempsey knew full well that Plaintiff did not, in fact, agree with such position). Plaintiff declined to do so. Captain Dempsey's actions, too, were in furtherance of the anti-whistle-blower policy of the LASD.

26. Plaintiff continued to do the same work with the Federal Task Force but both were relocated to Pomona where he was working on an ongoing federal investigation of the Mexican Mafia (the "Mexican Mafia Investigation") which was subject to grand jury secrecy requirements. Despite this fact, Plaintiff's superiors demanded that he physically drive to the MCJ once a week to report on the investigation.

27. Part of the investigation in which Plaintiff and Lt. Lloyd were involved resulted in the interception and seizure of narcotics in the LASD. Plaintiff is informed and believes that on or about September 2, 2015, Defendant Sergeant Gabe Ramirez held a meeting advising the other OSJ Deputies not to cooperate or assist in any way in Plaintiff's and Lt. Lloyd's investigative efforts on behalf, and to only cooperate with the MCJ internal narcotics investigation team, again in an attempt to make him feel uncomfortable in retaliation for his whistle-blowing activity.

28. In response to this meeting, Lt. Lloyd wrote an email to defendants Ramirez

1 and Commander Christy Guyovich, among others, in which he requested cooperation
2 and a meeting to address the September 2, 2015 incident.

3     29. Thereafter, on or about September 9, 2015, Defendant Guyovich, Defendant
4 Lt. Milton Murphey, Defendant Lt. John Kepley and Plaintiff, among others, met to
5 discuss the September 2, 2015 incident and Lt. Lloyd's email. Plaintiff shared at that
6 meeting his suspicion that the lack of cooperation he was receiving was related to his
7 having offered testimony before the Federal Grand Jury and the Federal Courts
8 concerning corruption within the LASD, among others. While Defendants Murphy
9 and Kepley and appeared visibly upset and angry at the suggestion, Commander
10 Guyovich expressed both verbally and in writing a desire to fix the situation. She
11 also contended that the non-cooperation complained of by Plaintiff and Defendant
12 Lloyd was a matter of miscommunication, which would not happen again in the
13 future. Plaintiff is informed and believes that Defendants Murphy and Kepley were
14 trying to silence him through their anger, all in furtherance of LASD policy, and that
15 Commander Guyovich was intentionally misleading him in anticipation of masking
16 the true purpose behind later adverse job actions which the Defendants all planned to
17 take against Plaintiff in the future.

18     30. Despite these assurances, in or about December of 2015, Deputy Christopher
19 Hernandez of the LASD assisted Plaintiff in confiscating a significant amount of
20 narcotices which a gang member attempted to smuggle into the MCJ. Defendant
21 Sergeant Ramirez reprimanded Deputy Hernandez for doing so and told him to only
22 work with OSJ members located within the MCJ.

23 **The Adverse Job Actions**.

24     31. In mid-2016, Defendants transitioned from making hostile and intimidating
25 comments to taking affirmative adverse job actions against not only Plaintiff, but the
26 persons assisting him. Plaintiff is informed and believes and thereon alleges that
27 Defendants acted and planned these actions together and that each of them endorsed
28 the other's actions. In May of 2016, Defendants fired Deputy Hernandez ostensibly

based upon his purportedly having used a password other than his own to log onto the ITMS. In fact, Plaintiff is informed and believes that Deputy Hernandez was fired because of his cooperation with Plaintiff's investigations for the Federal Task Force. Plaintiff is also informed and believes and thereon alleges that the Defendants, acting in concert, engaged in the remaining adverse job actions described hereinbelow in an effort to destroy Plaintiff's career and force him out of the LASD.

32. In August of 2016, Defendants' adverse job actions turned to Plaintiff and Defendants engaged in a series of actions that have and will impact Plaintiff's ability to advance, promote and/or obtain assignments to coveted positions. Plaintiff was transferred out of the highly coveted investigative position he held to an unfavorable position in patrol school against his wishes. This change did and will continue to adversely effect his ability to advance and promote because it constitutes a negative entry in his electronic employment record. To add insult to injury, after patrol school, Plaintiff was shunned. No one would eat with him, and very few of the training officers talked with him. Plaintiff was forced to eat off the trunk of his patrol car while the other deputies would go inside restaurants to eat dinner. At some point in or about September of 2016, Plaintiff's training officer, Defendant Brandon Lefevre, echoing the words of Defendant Eric Para, stated that Plaintiff was not to be trusted because of his work with the federal authorities.

33. At this point, the stress from LASD's harassment began to become unbearable and Plaintiff began to suffer from physical manifestations of that stress. Most notably, the stress caused Plaintiff to begin to suffer from anxiety, major weight loss, irritable bowel syndrome ("IBS") with attendent inability to control his bowel movements.

34. In November of 2016 and again in January of 2017, Plaintiff was placed off work based upon his doctor's orders. Thereafter, Plaintiff communicated with his current immediate supervisor, Defendant Captain Patrick Valdez, requesting a transfer out of patrol training and back to the custody division of the LASD. Plaintiff

explained that the principal reason for his request was his concern that his bowel problems might lead to Plaintiff defecate while out on patrol and out of reach of a bathroom. Plaintiff is informed that but for his whistle-blowing activities, his requests would have been summarily granted. Defendants, however, as shall be seen, seized upon the opportunity of the illness they had created in Plaintiff to greatly increase the effect of their anti-whistleblower activities against Plaintiff.

35. In early February, Defendant Captain Valdez communicated to Plaintiff that he could not transfer back into custody unless he received a doctor's notice. Approximately one week later, Plaintiff attended an "interactive processes meeting" conducted by, among others, Defendant Sgt. Yvonne O' Brien and Defendant Jessica Tend. Plaintiff explained at this meeting that he was having difficulties traveling long distances and asked if he could obtain a temporary placement closer to home which would reduce his difficulties in traveling. Defendant O'Brien's response was to assign Plaintiff to work in the inmate reception center reporting directly to Defendant Gina Parra who was the wife of Defendant Chief Eric Parra.

36. At this point, Plaintiff is informed and believes and thereon alleges that his fellow whistleblower, Lt. Kevin Lloyd, learned that Plaintiff was to be supervised by Eric Parra's wife and communicated to one or more persons in authority and expressed his reservations at Gina Parra's being assigned to supervise Plaintiff in light of her husband's open animus toward Plaintiff. Plaintiff is informed and believes and thereon alleges that Defendant Gina Parra actually was working in concert with her husband and the other Defendants (including, in particular, Defendants Sgt. O'Brien and Lieut. Joel Barnett) to implement the corrupt policy of the LASD.

37. Later that evening, Defendant Sgt. O'Brien called Plaintiff and home and told him that the position he had been offered in the IRC was no longer available. Another interactive processes meeting followed in which defendants Sgt. O'Brien and Lieut. Joel Barnett both participated. Now, despite the fact that Plaintiff's stated medical reason for needing the transfer was to be put in a position where he would

have easier access to a bathroom, Defendants Sgt. O'Brien and Lt. Barnett now told Plaintiff that he would need to report to work in a location more than 45 minutes drive from his home. Plaintiff explained to Defendants O'Brien and Barnett that he was deeply concerned that such an assignment would put them in a position where he might lose control of his bowels while driving. They did not show sympathy. Plaintiff acceded to their wishes and attempted to fulfill his new assignment.

38. Approximately two weeks later, Plaintiff was traveling to his new assignment it was caught in traffic, lost control of his bowels and defecated all over himself in the car. The experience was extremely humiliating to Plaintiff and caused him deep emotional distress.

39. Thereafter, otherinteractive processes meetings followed, with the Defendants offering similarly unsatisfactory options to Plaintiff which Plaintiff is informed and believes and thereon alleges were specifically formulated to be unacceptable to Plaintiff.

40. Plaintiff's physical condition has worsened from the stress of the treatment which he has received. Plaintiff is informed and believes and thereon alleges that were the Defendants to stop engaging in hostile retaliatory action against him, and if he were given a reasonable period of time to recover thereafter, his condition would improve and he would be able to fulfill his prior duties as an investigative officer within the OSJ unit of the LASD. Furthermore, Plaintiff would be able to perform most of such duties even now, if allowed to do so. Defendants, however, continue to fail and refused to provide Plaintiff with an appropriate accommodation all in an effort to punish Plaintiff for his participation and cooperation in the various federal investigations in court proceedings referred to in this complaint. The Defendant Los Angeles County, rather than repudiating these acts by the LASD, has embraced and ratified them.

41. This lawsuit is the result.

## **CAUSES OF ACTION**

PRINTED ON RECYCLED PAPER

# COUNT ONE

**Constitutional and Civil Rights Pursuant to 42 U.S.C. §§ 1983, 1988 Violation of First Amendment Speech Rights**

**(Against all Defendants)**

42. The foregoing allegations are incorporated as if re-alleged herein in full.

43. Through the foregoing acts, and each of them, the Defendants sought to and did retaliate against Plaintiff for his exercise of his constitutional right of free speech and did so under color of their authority as law enforcement officers. Defendants' efforts in this regard were also were intended to protect the Defendants' ongoing abuse under color of law of the constitutional rights of the inmates under their supervision.

44. As a result of the wrongdoing of Defendants, and each of them, Plaintiff suffered emotional and physical symptoms including extreme stress, crying jags, headaches, muscular pain and hair loss. Plaintiff also endured the loss of his chosen career.

45. As a result of the foregoing, Plaintiff has been damaged in an amount presently unknown to him, but to be proven at time of trial, but in no event less than $5,000,000.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

A. For appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants.

B. For appropriate compensatory damages in an amount to be determined at trial;

C. For civil penalties.

D. For appropriate equitable relief against all Defendants as allowed by the Civil Rights Act of 1871, 42 U.S.C. Section 1983, including the enjoining and permanent restraining of these violations, and direction to Defendants to take such affirmative action as is necessary to ensure that the effects of the unconstitutional and unlawful

employment practices are eliminated and do not continue to affect Plaintiff's, or others', employment opportunities;

E. For an award of reasonable attorney's fees and costs on his behalf expended as to such Defendants; and

/ / /

F. For such other and further relief to which Plaintiff may show himself justly entitled.

**PLAINTIFF REQUESTS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated: September 24, 2018          THE LAW OFFICES OF JOHN A. SCHLAFF

By _____
   John A. Schlaff
   Counsel for Plaintiff, Noah Kirk